**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X

ERIN BASKETT,                                          :
                                                       :
                              Plaintiff,               :      Civil Case No.:
                                                       :
              v.                                       :
                                                       :
AUTONOMOUS RESEARCH LLP,                               :      **COMPLAINT**
AUTONOMOUS RESEARCH US LP, and                         :
STUART GRAHAM, ERICKSON DAVIS,                         :
JONATHAN FIRKINS and SAMANTHA                          :
GUTHRIE, each in their individual and professional     :      **JURY TRIAL DEMANDED**
capacities,                                            :
                                                       :
                              Defendants.              :
------------------------------------------------------------- X

Plaintiff Erin Baskett hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Erin Baskett joined Autonomous (also referred to as the "Firm"), a London-based

financial research firm, in 2012 and was instrumental in building the Firm's New York office

from the ground up, as well as in establishing compliance with U.S. securities laws in the office

and others.  However, Autonomous took steps to cast Ms. Baskett aside once the offices were up

and running and, when she spoke up about various Financial Industry Regulatory Authority

("FINRA") and U.S. Securities and Exchange Commission ("SEC") rules and regulations the

Firm was violating, the Firm's executive management began a hostile and open campaign of

retaliation against Ms. Baskett to force her out of the Firm.

2.      Throughout her employment at Autonomous, Ms. Baskett consistently and

accurately raised compliance concerns to the Firm's executives, including CEO Erickson Davis

and CFO Jonathan Firkins.  However, the Firm's compliance practices began to deteriorate in

April 2016 when the Firm demoted Ms. Baskett by taking her out of Mr. Davis's reporting line

and ordering her to instead report to his subordinates.  Ms. Baskett also was stripped of her supervisory responsibilities and was required to go through Mr. Firkins or the newly installed Head of Compliance, Samantha Guthrie (who had much less experience than and previously reported to Ms. Baskett), for approval on even the most routine decisions.

3.     Ms. Baskett's demotion meant that there was no longer anyone in the U.S. office authorized to supervise day-to-day operations of the New York office, and this therefore placed Autonomous in obvious violation of several U.S. securities rules and regulations.  Nevertheless, the more Ms. Baskett reported and raised this significant compliance issue at the Firm, the more Autonomous reduced her role and cut her out of communications and meetings critical to her job. Autonomous's retaliation against Ms. Baskett came to a head in February 2017, when she lodged additional protected complaints through counsel and, shortly thereafter, to FINRA when it began an audit of the Firm.

4.     Autonomous doubled down on its retaliation against Ms. Baskett in the following months, sending her antagonistic communications that baselessly and falsely accused her of failing to do her job.  Firm representatives also engaged in blatant misdirection and misrepresentation in a FINRA audit with regard to the Firm's supervisory structure and operations, among other matters, despite the existence of emails and other evidence demonstrating that its reporting lines were out of compliance with U.S. securities laws.

5.     Recently, the Firm has also begun to package detailed research reports as purported "sales commentaries" in order to take advantage of new regulations in the U.K. that allow them to sell such reports for profit.  However, as Ms. Baskett – and recently, FINRA as well – has informed the Firm, its practices are noncompliant with FINRA rules and SEC regulations. Autonomous has ignored these warnings and proceeded as planned, responding to Ms. Baskett's

continued stalwart warnings on compliance by isolating her from ongoing discussions on decisions regarding its research reports.

6.     Furthermore, throughout her employment, Autonomous has compensated Ms. Baskett at a far lower rate than her male peers and, unsurprisingly, retaliated against her in the terms of her employment when she spoke up about her discriminatorily-disparate pay.

7.     Autonomous's London-based executive leadership clearly has made a deliberate choice to prioritize its desires to grow into a global firm to the benefit of its inner circle of top male executives, even if those goals entail brazenly ignoring the fact that its practices violate U.S. securities regulations and anti-discrimination laws.  In pursuit of these goals, the Firm has engaged in various efforts to bludgeon Ms. Baskett into silence or exiting the Firm, even as she keeps making lonely efforts to protect the Firm from massive liability for its own regulatory and legal violations.

8.     Ms. Baskett seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices, including unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Equal Pay Act of 1963, 29 U. S. C. § 206(d) ("EPA"), the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, New York Administrative Code §§ 8-101 *et seq.* ("NYCHRL"), the New York Equal Pay Law, New York Labor Law § 194  ("EPL") and the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A  ("SOX").

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights

under Title VII and the EPA.  The Court has supplemental jurisdiction over Plaintiff's related

claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

10.     Pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), venue is proper in this

district because a substantial part of the events or omissions giving rise to this action, including

the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

11.     On May 8, 2016, Plaintiff filed a Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC").

12.     On August 25, 2017, Plaintiff received a Notice of Right to Sue from the EEOC.

Fewer than 90 days have passed since Plaintiff received her Notice of Right to Sue.

13.     After commencement of this action, a copy of the Complaint will be served on the

New York City Commission on Human Rights and the Office of Corporation Counsel of the City

of New York, thereby satisfying the notice requirements of the New York City Administrative

Code.

14.     On April 12, 2017, Plaintiff filed a Complaint with the Occupational Safety and

Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of

Section 806 of SOX.

15.     On October 31, 2017, OSHA released Plaintiff's Complaint.

16.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

17.     Plaintiff Erin Baskett is a partner at Autonomous US LP.  At all relevant times,

Ms. Baskett was an "employee" under all applicable statutes.

18.     Defendant Autonomous Research LLP is a United Kingdom foreign limited liability partnership, headquartered in London, with its principal place of business located at 1 Bartholomew Lane, Floor 2, London EC2N 2AX, United Kingdom.  At all relevant times, Autonomous Research LLP was an "employer" under the Sarbanes-Oxley Act.

19.     Defendant Autonomous Research US LP is a Delaware foreign limited partnership, headquartered in New York City, with its principal place of business located at 1325 Avenue of the Americas, 23rd Floor, Suite 2303, New York, New York 10019.  At all relevant times, Autonomous Research US LP was an "employer" under all relevant statutes.

20.     Defendant Autonomous Research LLP and Defendant Autonomous Research US consist of at least 50 percent common interest of shareholders, there is substantial crossover between the officers and each shares the same Chief Executive Officer.  As such, Defendant Autonomous Research US LP is the alter ego of Defendant Autonomous Research LLP.

21.     Defendant Autonomous Research LLP and Defendant Autonomous Research US LP (the corporate Defendants) are collectively referred to herein as "Autonomous."

22.     Defendant Stuart Graham is the former Chief Executive Officer ("CEO") and a current Partner of Autonomous.  At all relevant times, Mr. Graham supervised the employment of Ms. Baskett and, accordingly, was an "employer" under all relevant statutes.

23.     Defendant Erickson Davis is the former Deputy CEO and current CEO of Autonomous.  From early 2014 through December 2016, Mr. Davis supervised the employment of Ms. Baskett and, accordingly, was an "employer" under all relevant statutes.

24.     Defendant Jonathan Firkins is a Managing Partner and Global Chief Financial Officer ("CFO") of Autonomous's London office.  Since December 2016, Mr. Firkins has

supervised the employment of Ms. Baskett and, accordingly, was an "employer" under all relevant statutes.

25.     Defendant Samantha Guthrie is a Partner and current Global Head of Compliance at Autonomous.  Since December 2016, Ms. Guthrie has supervised the employment of Ms. Baskett and, accordingly, was an "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

A.     **Ms. Baskett's Instrumental Role in Founding and Fostering Compliance at Autonomous**

26.     Ms. Baskett is a highly-accomplished financial executive who joined Autonomous, a financial research firm, in August 2012.

27.     Ms. Baskett previously served as CFO at a broker-dealer and as a regional investment advisor in St. Louis, Missouri.  Therefore, Ms. Baskett was one of three individuals designated as the Managing/Founding Partners who were responsible for launching the United States office of Autonomous, located in New York City.

28.     From the beginning, Ms. Baskett played the major role in ensuring that Autonomous's U.S. entity was compliant with all applicable financial services and tax laws, rules and regulations.  She virtually single-handedly fulfilled this role in the U.S. and, later, in other Autonomous locations, such as Hong Kong.

29.     As part of her duties and responsibilities before the official launch of the U.S. office in December 2012, Ms. Baskett set up a compliance monitoring structure for the Firm, hired staff and ensured that the Firm was fully compliant with applicable SEC regulations and FINRA rules, regulations and standards.

30.     Ms. Baskett's performance, work ethic, industry knowledge, decision-making and ability to drive profitability have been widely acknowledged at Autonomous.  In fact, she has

been applauded by senior management for her ability to collect millions of dollars in fees that Autonomous's sales staff was unsuccessful in collecting.

31.     Ms. Baskett also was indispensable in obtaining multiple flawless audit reports for Autonomous from FINRA.

32.     In 2014, in recognition of her undisputed and obvious success, Ms. Baskett was asked to oversee compliance and audits for Autonomous's London headquarters as well, which had been plagued with compliance issues under the Firm's current Managing Partner and CFO, Mr. Firkins.

33.     After Ms. Baskett assumed compliance responsibilities for the London office, however, its regulatory compliance dramatically and rapidly improved, as evidenced by the London office's strong audit reports under Ms. Baskett.

34.     Also in 2014, the regulatory compliance that Ms. Baskett achieved for the London office, which had previously seemed unattainable, was further recognized when she was asked to create and run compliance for the Firm's Hong Kong office.

35.     Throughout the 2015 calendar year, Ms. Baskett was in charge of compliance globally.

36.     Ms. Baskett's contributions to Autonomous were also reflected year after year in her performance reviews.

37.     By way of example only, in her 2016 review, Ms. Baskett was told that she was one of the hardest-working and most dedicated partners at the Firm.

38.     Ms. Baskett devoted nights, weekends, vacations, maternity leave and even sabbaticals (during which phone and email were supposed to be disconnected) to the Firm without complaint.  Ms. Baskett's "360-degree" reviews further bear out her value to

Autonomous, as some of her peers stated and/or wrote that she was the "backbone of the NY office," had Autonomous's "best interest in mind," and that if she were to leave the Firm, they would resign immediately, as the Firm would not be the same without her.

39.     Put simply, Ms. Baskett built the Firm's U.S. office from the ground up and was integral to its success.

**B.      For the Duration of Her Employment at Autonomous, Ms. Baskett Has Been Grossly Underpaid in Comparison to Similarly-Situated Male Colleagues**

40.     Throughout her tenure at the Firm, Autonomous has increasingly relied upon Ms. Baskett to conduct broad compliance, legal, Human Resources and finance functions at both a Firm-wide and international level.

41.     Though Ms. Baskett has dutifully executed these responsibilities, the value of her work over the years has not been reflected in her pay, particularly in comparison to that of her male colleagues who are similarly-situated or even lower-ranking in terms of seniority and responsibility.

42.     Female employees have been a rare presence at the Firm's higher levels.  Indeed, through mid-2013, Ms. Baskett was the only female partner at the Firm and one of a small group of managing partners.  To this day, she remains the only female partner in the U.S. office.  Nevertheless, she was paid approximately 28% less than the standard base salary suggested for all partners.

43.     By way of example only, her overall compensation target in Fiscal Year 2013 was a mere fraction of the pay of her male counterparts, who made approximately equivalent or lesser contributions to the establishment of the U.S. office.

44.     Specifically, in fiscal year 2013, Partner A, a managing partner performing the same job functions as Ms. Baskett, earned approximately four times Ms. Baskett's total

compensation, and Partner B, another similarly-situated male partner, earned nearly an exponential ten times Ms. Baskett's total pay for the year.[1]

45.     Ms. Baskett has also been subjected to severe disparities in bonus payments, which often make up more than half of the total compensation of Autonomous partners.

46.     Ms. Baskett has been privy to discussions regarding new-hire compensation that demonstrate that her lower pay is the product of a systemic gender pay gap at Autonomous.

47.     For example, male partners who started with the Firm shortly after Ms. Baskett were compensated on average two and a half to over three multiples of Ms. Baskett's annual base pay, whereas Ms. Baskett's pay languished and lagged behind theirs at a level well less than half of theirs.

48.     Ms. Baskett first complained about the unlawful role that her gender has played in decisions regarding her employment in early 2013, when she spoke with Mr. Graham and Mr. Firkins about it.

49.     Ms. Baskett pointed out to them that she was the only U.S. partner (out of approximately ten others at the time, most of whom had tenures at the Firm far shorter than her own) who was paid a base salary 28% less than the standard base partner salary.

50.     Ms. Baskett was offered an explanation that was irrelevant and unconvincing – that her base salary was lower because she had relocated from Missouri (despite the fact that the cost of living in the New York area is the same for all executive employees, even those who happen to have moved from somewhere else or happen to be women).

---

[1]     While Ms. Baskett is capable of identifying the names and compensation of Partners A, B, C and D, she is voluntarily withholding those names in order to avoid any assertion that she has somehow violated a confidentiality agreement which she was required to sign as a condition of her employment.

51.     Ms. Baskett was living and working in New York during her time at Autonomous, not in Missouri.  Indeed, as Autonomous well knew, Ms. Baskett had moved to New York in 2012 to help found the Firm's U.S. office.  This excuse and brush-off made no sense.

52.     The condescending and dismissive response to Ms. Baskett's very legitimate concerns solidified her impression that, because she is a woman, she would never be granted the recognition she had worked for and earned, and that serious limitations had been imposed upon her future at the Firm.

53.     From 2012 to 2013, Ms. Baskett was discriminatorily paid less than Partner A. Ms. Baskett performed nearly all of Partner A's duties as CEO, which resulted in his eventual demotion.

54.     Notably, although Ms. Baskett served as the effective CEO of the Firm, she was neither promoted nor provided an increase in compensation to the level of the Firm's male partners.

55.     After Ms. Baskett's hire in late 2012, Partner A was paid over one and a half times the amount Ms. Baskett was paid due to her gender.  In 2013, Partner A was paid a total compensation nearly three times the compensation Ms. Baskett received that year.  Again, this disparity in pay was a byproduct of the Firm's discriminatory pay decisions due to Ms. Baskett's gender, as she was performing most of the functions that her male colleague should have been.

56.     The disparity between Ms. Baskett's pay and that of Partner C from 2012 to 2014 further illustrates the gender pay gap at Autonomous, as Partner C and Ms. Baskett held roles that required equal skill, effort and responsibility, and both worked under similar conditions, though she performed at a much higher level.

57.     Partner C held a similar title as Ms. Baskett, but works out of the U.K. office (where employees are notably typically paid at a lower scale than those in the U.S. office) and his duties were essentially the same from 2012 through 2014.

58.     Ms. Baskett is aware that Partner C was paid approximately twice as much as Ms. Baskett in 2013.  Even after Ms. Baskett's compensation was increased as a result of her early 2013 discrimination complaint, her pay still has never reached the level of Partner C's highest compensation.

59.     While Ms. Baskett is unaware of Partner C's most recent salary figures, she is aware that he received roughly 38% more than Ms. Baskett in total compensation for 2015, and it is reasonable to assume that Partner C's base salary and bonus have increased since then, as she understands this to have been the case for most, if not all, of the other male Autonomous partners.

60.     Similarly, Ms. Baskett's compensation was discriminatorily capped below that of Partner D, another similarly-situated male colleague, from 2014 through 2016.  During this period, Partner D and Ms. Baskett held roles that required equal skill, effort and responsibility, and worked under similar conditions, though Ms. Baskett also performed at an indisputably higher level than him.

61.     Between 2014 and 2016, Partner D and Ms. Baskett had virtually identical responsibilities.  Further, Ms. Baskett was objectively more qualified for Partner D's role than he was and, crucially, Ms. Baskett held the licenses required for the role – whereas Partner D did not.  She therefore had to fulfill many of Partner D's duties while he awaited the results of his exams.  Many of these duties were those Ms. Baskett had performed since the Firm's inception,

often in place of Partner A.  In fact, Ms. Baskett continued to carry out these responsibilities, even after Partner D finally received his required license in 2015.

62.     Ms. Baskett is aware that Partner D was compensated significantly more than what Ms. Baskett was compensated in 2014, 2015 and 2016, including over double Ms. Baskett's compensation for 2015 and 2016.

**C.     Ms. Baskett Is Passed Over for a Promotion and Raise in Favor of an Unqualified and Unlicensed Male Colleague**

63.     In or around late 2013 or early 2014, Ms. Baskett raised concerns to Mr. Graham and Mr. Firkins that, although she was a Managing Partner and notably had provided a greater range of valuable service to the Firm than standard partners or staff, persistent gender-driven compensation disparities increasingly raised questions as to her ability to stay on with the Firm.

64.     Due to the risk of losing Ms. Baskett, in early 2013 Autonomous offered Ms. Baskett an immediate increase of her base salary as well as a future pay increase.

65.     This offer of a future pay increase was not guaranteed and no specified time was put on it, and in any case would merely have raised Ms. Baskett's pay to the level paid to some of the Firm's male partners, many of whom were far less valuable to Autonomous.

66.     In early 2014, Ms. Baskett again raised concerns to Mr. Graham and Mr. Firkins that persistent gender-driven compensation disparities increasingly raised questions as to her ability to stay on with the Firm.

67.     Ms. Baskett began to look for other work.  When Autonomous learned that she intended to resign from her position, Mr. Graham immediately reached out to Ms. Baskett to offer her a pay increase , a doubling in equity in the U.S. office to 1%, as well as guaranteed shares in the new Hong Kong entity that she would be responsible for launching.

68.     Mr. Graham told Ms. Baskett that he wanted her to be his "right hand" in the U.S. office, reporting directly to him on certain global matters.  This convinced Ms. Baskett to stay with the Firm.

69.     However, shortly thereafter, Autonomous promoted then-lead salesman Mr. Davis to the position of Deputy CEO, effectively giving him all of the duties that had been promised to Ms. Baskett.

70.     Mr. Davis had no prior executive experience or history running the operations of a firm, whereas Ms. Baskett was more than qualified to take on this position.

71.     Moreover, and crucially, Mr. Davis did not have the Series 24 license necessary to complete his new job functions under applicable federal and industry regulations.

72.     Ms. Baskett had already obtained her Series 24 license before joining Autonomous, making her objectively more qualified for the role, while the selection of Mr. Davis exposed the Firm to serious liability during the significant period when he occupied the position, despite the fact that he lacked the required license for it.

73.     In an effort to mitigate the impact of its decision to promote Mr. Davis, the Firm designated him as the "interim" Head of U.S. Operations, while leaving Ms. Baskett to perform the functions of President/Head of US Operations and maintain the necessary certifications per SEC regulations.

74.     Therefore, by promoting Mr. Davis, Autonomous effectively decided that, for at least the next year, it would have unlicensed employees managing the brokerage and making day-to-day decisions, instead of its licensed partner, Ms. Baskett.

75.     Ms. Baskett reasonably believed that this conduct put both Autonomous and Ms. Baskett at serious regulatory risk.  Moreover, Ms. Baskett would later learn that, even after Mr.

Davis obtained his license, Autonomous would steadfastly refuse to take the simple, common sense step of reforming its reporting structure in order to restore compliance.

76.     Since then, Ms. Baskett has repeatedly voiced her concerns about, and objected to, this noncompliant state of affairs to senior management.  Ms. Baskett also, at that time, raised various other concerns that she reasonably believed constituted regulatory violations that began creeping up with her increasingly-sidelined role.

77.     Indeed, Ms. Baskett's protected complaints have been so numerous they could not possibly all be listed here.

78.     However, Ms. Baskett has made protected complaints and reported to Firm leadership about, among many other things, improper disclaimers that incorrectly reflected the global registrations of broker-dealers and the Firm's failure to follow various regulations, including securities regulations administered and enforced by FINRA and the SEC.

79.     Ms. Baskett has also escalated concerns about the Firm improperly rolling out new business ventures and drafting legal terms, disclaimers and agreements for them that were not in compliance with applicable regulations.

80.     Additionally, Ms. Baskett has expressed concern regarding Autonomous's failure to file Firm registrations and report personal outside business interests, which are a source of potential conflicts, with regulatory agencies.

81.     Further, on multiple occasions, Ms. Baskett has discovered, caught and corrected written procedures, commentaries and disclaimers that had been approved by Ms. Guthrie (who replaced her as the head of compliance, in another instance of retaliation by the Firm) and, if published, would have exposed the Firm to liability totaling hundreds of thousands of dollars due to the copious errors contained therein.

82.     Ms. Baskett also has been forced to intercept – and was met with antagonism for doing so – public communications by the Firm that unlawfully incorporated certain government seals, such as that of the Department of the Treasury.

83.     Similarly, Ms. Baskett has identified numerous errors by Mr. Firkins in regulatory reporting and accounting reconciliations which had been approved by him and performed under his supervision by third-party consultants.

84.     Ms. Baskett also made a protected complaint when Mr. Firkins advised the Firm that its sale of interest in the U.S. office could be done without tax implications if posed under the title of "good will."  Ms. Baskett immediately advised against the action, informing Mr. Firkins and the Firm that such action would constitute tax fraud.

85.     However, as detailed below, all of these complaints have not just fallen on deaf ears, but have been met with hostility by senior management.

**D.     Autonomous Implements a Global Restructuring, Resulting in Ms. Baskett's Demotion in Retaliation for Her Protected Activity**

86.     In late 2015, the Firm's London headquarters began to pursue a global "restructuring," and asked Ms. Baskett and Messrs. Graham, Davis and Firkins to determine collectively how the various branches of Autonomous would be structured and how various executives' roles would be modified.

87.     While Ms. Baskett vehemently objected to the change on the basis of what she reasonably believed to be glaring compliance concerns, Autonomous decided that one of Ms. Baskett's direct subordinates, Samantha Guthrie, who did not and still does not hold the requisite license, should be given the role of Global Head of Compliance instead of and over Ms. Baskett.

88.     This was done despite the Firm's exclusive reliance on Ms. Baskett's Series 24 license to manage its day-to-day U.S. business and Hong Kong compliance, as well as the fact that Ms. Baskett had largely built and re-defined the Firm's global compliance structure.

89.     Ms. Guthrie was not qualified for the Global CCO role with Autonomous, lacked the necessary license for the role and had training and experience that was much less than that of Ms. Baskett.

90.     As Ms. Baskett repeatedly attempted to impress upon the Firm, Ms. Guthrie's lack of qualifications and licenses caused her holding of this post to constantly expose Autonomous to serious liability.

91.     By way of example only, Ms. Guthrie, during her tenure as Global Chief Compliance Officer ("CCO"), has evinced a lack of knowledge regarding which regulatory authority makes legislation in Hong Kong or which Chinese rules and regulations apply to Autonomous's Hong Kong entity.

92.     Due to this lack of rudimentary knowledge by the nominal global CCO, the head of the Hong Kong office has instead continued to rely on Ms. Baskett as the Firm's qualified expert regarding Hong Kong operations.

93.     The Firm's supplanting of Ms. Baskett with Ms. Guthrie was a clear demotion, and was intended to send a message to Ms. Baskett to cease what Firm leadership saw as her compliance complaints' hindering of Firm business.

94.     Prior to her demotion, Ms. Baskett had reported directly to Mr. Graham and Mr. Davis.  However, after her demotion, her reporting relationships became vague and obscure – she was given contradictory information to suit the Firm's purposes (day-to-day business versus keeping up appearances for compliance reasons).  Nevertheless, given Ms. Guthrie's

unsuitability for her position with regard to matters of global compliance and out of a desire to make sure her concerns were addressed, Ms. Baskett continued to raise issues with Mr. Davis directly throughout 2016.

95. Further, although Ms. Baskett's base compensation was not affected by her demotion, her bonus amount for 2016 was severely reduced.

96. Ms. Baskett's November 2016 semi-annual bonus was the same as the one for the previous November, despite the total bonus pool being up over 20%, which typically has driven her bonus amount.

97. When she questioned her bonus, Ms. Baskett was told by Mr. Davis and Mr. Firkins that, "You should be happy with that, given you were demoted in title."

98. In April 2016, understandably frustrated by the demotion, Ms. Baskett approached Mr. Firkins to ask how Autonomous had arrived at the decision.

99. Mr. Firkins at first claimed that the decision was based on Ms. Guthrie's residence in the U.K. and her superior breadth of knowledge.

100. Ms. Baskett rejected both of these explanations, as she had explicitly offered to move to the U.K. during deliberations about the restructuring, and both she and Mr. Firkins knew that Ms. Baskett was the most qualified person for the job, and certainly more so than Ms. Guthrie.

101. Eventually, Mr. Firkins dropped any pretense that the decision had been based on merit or some other legitimate basis, and admitted to Ms. Baskett that he had made the decision to "teach [her] a lesson," a blatant reference to the various compliance concerns Ms. Baskett had raised (including regarding the London office, which had been Mr. Firkins's responsibility, and which he falsely viewed as Ms. Baskett going after his job).

102.    In addition, Ms. Baskett has been blamed for somehow causing "tension" between herself and Ms. Guthrie, as well as with Mr. Firkins, since they assumed their new positions (and Ms. Baskett was compelled to alert the Firm to its deteriorating compliance position).

103.    Tellingly, the only negative comment Ms. Baskett has received in performance reviews was premised on a purported need to improve her relationship with Ms. Guthrie.  Indeed, Autonomous outwardly has sought to portray Ms. Baskett's moves to protect the Firm as insults to the character and performance of its executives.

104.    This is evident from Mr. Firkins's own admissions (made on Firm-recorded phone calls) that he took steps to spread false rumors at the Firm about Ms. Baskett's supposedly difficult personality.

105.    Mr. Firkins's statement made clear that Ms. Baskett's repeated protected complaints were a contributing factor, and even the sole factor, in Autonomous's decision to demote Ms. Baskett.

106.    As a result, Ms. Baskett has been unlawfully demoted and prevented from advancing within the Firm, causing severe damage to her income, career and professional reputation.

107.    Since the global restructuring in April 2016, Ms. Baskett also has been forced into a particularly compromising situation with Ms. Guthrie.

108.    Ms. Guthrie has taken multiple actions that Ms. Baskett reasonably believed resulted in SEC violations (as well as violations of regulations promulgated by the Hong Kong Securities and Futures Commission), or which would have resulted in violations had Ms. Baskett not corrected them promptly.

109.    Ms. Baskett has had to fight vigorously to protect the best interests of the Firm, as well as her own reputation and professional license.  Additionally, given that she holds a position on FINRA's District 10 Committee, Ms. Baskett must be especially attentive to maintaining the highest levels of integrity.

110.    In response to her speaking out regarding the conduct or errors of her superiors (and correcting those errors), the Firm has unlawfully retaliated by casting Ms. Baskett in a negative light and labeling her as abrasive and obstructive (in addition to previously denying her a promotion and demoting her), simply because she is a self-possessed and hardworking woman with integrity.

111.    However, in virtually every case, the legitimacy of Ms. Baskett's complaints has been affirmed by independent consultants and/or regulatory authorities.

112.    In Ms. Baskett's November 2016 review, Mr. Davis and Mr. Firkins, in response to concerns raised by Ms. Baskett about the manner of Ms. Guthrie's responses to the compliance issues raised by Ms. Baskett, said that Ms. Guthrie was frustrated by her complaints, and purportedly believed that Ms. Baskett was somehow doing so in order to somehow be obstructive or undermine Ms. Guthrie's authority.

113.    This admission is direct evidence of the retaliatory animus and excuses for actions taken against Ms. Baskett that are directly tied to her protected complaints.

114.    Andrew Crean, a Managing Partner at Autonomous and prior member of the U.K. Board of Directors, was asked to meet with Ms. Guthrie and Ms. Baskett separately, supposedly in order to find a path forward for Ms. Baskett at the Firm.

115.    Ms. Baskett made it clear to Mr. Crean that the supposed personality conflict between herself and Ms. Guthrie was a symptom of a broader set of problems plaguing

Autonomous's compliance functions and operations, and that her complaints and grievances had largely been ignored.  Mr. Crean's inquiries with Ms. Baskett barely scratched the surface.

116.    Further, as summarized in an email from Mr. Crean, he found that Ms. Guthrie's self-proclaimed lack of authority sprang from her own apparent character and lack of knowledge of FINRA rules and Hong Kong regulatory matters, which were legitimate grounds for Ms. Baskett's grievances.

117.    In November 2016, when Ms. Baskett saw that the Firm refused to address her legally sound protected complaints, she sought assistance from Mr. Crean.  Once Ms. Baskett explained why she took issue with the post-restructuring reporting lines at the Firm, Mr. Crean agreed with her concerns and said that he would talk with Mr. Graham and Mr. Davis to see if he could convince them to correct the Firm's noncompliant practices.

118.    On December 13, 2016, Mr. Graham, Mr. Davis and Mr. Crean sent a series of emails to one another regarding Ms. Baskett's complaints about the noncompliant reporting structure.  At the end of this email exchange, Mr. Crean told Mr. Davis: "Personally I don't see why she should not report directly in to you . . . However if this is not to be changed . . . perhaps she reports jointly to you and JF [Mr. Firkins] for finance and you and Sam for compliance?  Or she has right of review to you?"

119.    This proposed solution was conspicuously similar to proposals that Ms. Baskett had made repeatedly over the previous several months.

120.    Unfortunately, Autonomous rejected Mr. Crean's common sense suggestion (which, in the months since then, also has repeatedly been suggested by Ms. Baskett through her legal counsel).

121.     Instead, on a December 19, 2016 conference call with Ms. Baskett, Messrs. Graham, Davis and Firkins told her that they were committed to keeping the same noncompliant supervisory structure that was put in place in April 2016.  Ms. Baskett again objected that the reporting lines were noncompliant with FINRA rules (just as she did when the restructuring was first put into place).

122.     In response, Mr. Firkins flatly told Ms. Baskett that she no longer reported to Mr. Davis, that she was not to raise issues with Mr. Davis again and should instead report to Mr. Firkins and Ms. Guthrie, exclusively.

123.     In other words, Ms. Baskett's autonomy and responsibilities at the Firm were reduced yet again, amounting to another demotion.

124.     On December 21, 2016, two days later, Ms. Baskett followed up with Mr. Davis about her protected complaints regarding the Firm's reporting structure.

125.     In her email, Ms. Baskett asked Mr. Davis to share with her the Firm's final response after "looking into the various concerns/grievances I've raised previously."  Mr. Davis responded:

> "I have spoken with Stuart [Graham] about the concerns you have on reporting lines.   The corporate structure and management organization being put in place means that your reporting lines will be as discussed on the recent call with Stuart and Jon [Firkins] . . . nothing will be changing from what was communicated at the end of December.  I know this is not what you want to hear and appreciate that this will be disappointing you."

**E.      Ms. Baskett Lodges Additional Protected Complaints Regarding the Firm's
          <u>Packaging of Research Reports as Sales Commentaries in Violation of FINRA Rules</u>**

126.      In or around May or June 2016, Autonomous began to implement a new process,

allowing its London salespeople to formally track their recommendations and ratings generated

from so-called "desk commentaries."

127.      These "desk commentaries" are, in fact, much more accurately characterized as

research reports under U.S. regulations.

128.      However, by packaging this research as purported "desk commentaries,"

Autonomous sought to create a new revenue stream by selling these research reports to potential

clients, which will soon be lawful within the U.K. due to the implementation of the updated

Markets in Financial Instruments Directive ("MiFID II") regulations.

129.      When Ms. Baskett found out that these reports were going out not only to clients

in the U.K., but also to U.S. clients, she immediately raised the issue with Mr. Davis.

Specifically, Ms. Baskett told Mr. Davis that, regardless of what U.K. laws and regulations may

allow, FINRA rules and SEC regulations set strict limitations on the content of a "desk

commentary" that is disseminated within the U.S.

130.      A desk commentary is typically very brief, informally disseminated sales material

directed to institutional investors.  The content of desk commentary may mean, however, that it

actually becomes a "research report" under FINRA rules and SEC regulations.

131.      When a document amounts to a research report, rather than a mere desk

commentary, it must be subjected to rigorous supervisory review and include myriad disclaimers,

which also, of course, must be accurate.

132.      Ms. Baskett went to Mr. Davis with what she reasonably believed to be a major

concern, despite being told that her supervisors were Mr. Firkins and Ms. Guthrie, as her

complaints were generally ignored and/or met with hostility when she spoke to Mr. Firkins or Ms. Guthrie.

133.     Ms. Baskett's complaints generally were made verbally on the phone or in person.

134.     However, in July 2016, Mr. Davis emailed Mr. Graham and Mr. Firkins about Ms. Baskett's complaint, and Mr. Davis acknowledged that Autonomous's reports were in violation of applicable U.S. rules and regulations, stating, "We do not have appropriate FINRA disclosures and I have a stack of precedent examples of fines over this issue."

135.     Regrettably, the Firm did not heed Ms. Baskett's warnings, and Autonomous went ahead with charging and collecting money for these research reports (as permitted in the U.K., but not in the U.S.).

**F.     FINRA's Audit of Autonomous, Ms. Baskett's Complaints through Counsel and Even Further Retaliation by the Firm**

136.     In February 2017, Autonomous was undergoing an audit by FINRA, for which Ms. Baskett was designated as the main point of contact for the auditors.

137.     Notably, however, Autonomous required that Ms. Baskett be closely monitored by Ms. Guthrie throughout the audit, who was asked to sit in on even the most routine phone calls with the auditors.

138.     This heightened scrutiny and draconian supervision of Ms. Baskett was both an act of retaliation, in and of itself, and also a stark expression of Autonomous's paranoia regarding the noncompliant reporting structure that the audit might uncover (as well as regarding what Ms. Baskett might say to the auditors about it).

139.     In connection with the audit, Ms. Baskett prepared, among countless other materials, written supervisory procedures ("WSPs") reflecting the reporting lines and supervisory responsibilities within the Firm.

140.   The WSPs Ms. Baskett prepared and submitted to Ms. Guthrie (as she was now required to do) accurately reflected that she was supervised by Ms. Guthrie and Mr. Firkins, as she was ordered to do on December 19, 2016, and again on January 2, 2017.

141.   On February 13, 2017, Ms. Baskett's legal counsel submitted a letter on her behalf to the Firm's counsel detailing the allegations set forth herein up to this point.

142.   On February 20, 2017, less than one week after the correspondence from Ms. Baskett's counsel was received, executives at Autonomous, including, without limitation, Mr. Davis and Ms. Guthrie, contacted Ms. Baskett to pressure her to amend the WSPs.

143.   Specifically, Autonomous demanded that Ms. Baskett falsely represent to FINRA that she reported directly to Mr. Davis, despite the fact that, just two months earlier, she was explicitly instructed *never* to report or raise issues to him directly.

144.   Autonomous was aware that stripping Ms. Baskett of her authority to supervise the U.S. office created a reporting structure that was not compliant with FINRA rules and SEC regulations.

145.   However, the Firm's desire to represent to FINRA that Ms. Baskett reported directly to Mr. Davis in his global role – as opposed to Mr. Firkins and Ms. Guthrie – evinced a desire to conceal from FINRA that, as of December 19, 2016, no one within the U.S. office was authorized to manage day-to-day operations.

146.   When Ms. Baskett refused to amend the WSPs (just as she refused to lie to FINRA), Mr. Davis accused Ms. Baskett of failing to carry out her supervisory functions, despite Mr. Davis's firsthand knowledge that Ms. Baskett was still saddled with some of her supervisory functions, yet no longer had any real authority at Autonomous.

147.     Indeed, while supervisory duties such as making personnel decisions, setting compensation, conducting performance reviews for personnel such as traders or sales staff, authority and final approval over WSPs, and other day-to-day management tasks had been taken away from Ms. Baskett (and given to unregistered personnel), she has continued to dutifully execute her remaining supervisory functions.

148.     The assertion by Autonomous that Ms. Baskett has somehow not carried out her supervisory duties was and is completely spurious and dishonest, and Ms. Baskett was expressly ordered by Ms. Guthrie, her supervisor, to interface with FINRA for the audit.

149.     Autonomous's attempt to force Ms. Baskett to change the WSPs she had written to falsely state, among other things, that she reports to Mr. Davis was an obvious fraudulent and unlawful command, and was followed by further retaliation for her protected activity and principled stand.

150.     The Firm's retaliation continued, and on February 23, 2017, Mr. Davis and Mr. Graham called Ms. Baskett under the pretense of discussing the Firm's U.S. financials.

151.     However, shortly after getting her on the phone, Mr. Davis and Mr. Graham quickly dropped the subject and interrogated Ms. Baskett regarding her job description and reports to FINRA, and accused her of failing to carry out her job functions.

152.     The very next day, on February 24, 2017, Mr. Davis emailed Ms. Baskett with several dozen antagonistic questions regarding her job duties, demanding "yes" or "no" answers to each before the end of the day.

153.     Mr. Davis's email attempted to create a transparently false record of his conversations with Ms. Baskett, claiming variously that she failed to respond to his previous inquiries about her job functions or that she has given equivocal answers about them.

154. These accusations and the unreasonable demand for responses to his list of disingenuous questions by close of business only further demonstrated the retaliatory nature of and unscrupulous intentions behind such conduct.

155. On March 22, 2017, after a recent routine miscommunication between a trader and a customer regarding the pace at which the trader should sell the customer's shares, the trader reported the issue as an error, pursuant to the Firm's written policy, to Autonomous's Global Head of Trading, Traver Smart.

156. A difference of opinion arose between Ms. Guthrie and Ms. Baskett, during which Ms. Guthrie quite seriously (and incorrectly) accused the trader of assuming an error for the client to induce future business, at which point Mr. Davis falsely claimed that Ms. Baskett, rather than Mr. Smart, was responsible for supervising traders in the Firm's U.S. office.

157. Ms. Baskett does nominally hold the title of "Head Trader" in the U.S. office. However, her trading-related duties – both before and after Autonomous took various responsibilities away from her in late 2016 – consist of a high-level review of daily trade blotters for potentially malicious conduct, as is typical of a high-ranking compliance officer.

158. Ms. Baskett is very obviously not the day-to-day supervisor of the traders. Mr. Smart is the traders' supervisor, which is clear from routine Firm communications and documents, as well as the WSPs Ms. Baskett submitted to FINRA.

159. Notably, however, Autonomous was and is out of regulatory compliance because of its failure to have someone in the U.S. (rather than in the U.K. or elsewhere) who was authorized to manage the day-to-day activities and performance of U.S. traders.

160. Ms. Guthrie's attempt to create a false record that Ms. Baskett was supervising U.S. traders was obviously meant to mislead auditor and regulatory authorities and paper over

26

this regulatory problem.  This was only one more retaliatory attempt by Autonomous to lash out at Ms. Baskett for her protected activity and try to muddle through and skate by in its mid-2017 FINRA audit.

161.    Moreover, the true supervisory system in place for traders following the restructuring, as well as Autonomous's knowledge that the system was noncompliant with FINRA rules, is reflected through a recent email chain.

162.    Just before the global restructuring in April 2016, Mr. Davis and Mr. Smart exchanged emails regarding Mr. Smart's role supervising U.S. traders.  In the email chain, Mr. Davis asked Mr. Smart, "What is your plan for series 7 and series 24?  It's important you get these wrapped up ASAP so we can have you formally managing the group along with comp (**Erin can't have them reporting to you on FINRA org charts till that is finalized**)." (emphasis added).

163.    Mr. Smart, reluctant to "hack through Series 7 all over again," suggested that the Firm merely announce his role as Global Head of Trading, but continue to represent for external purposes that U.S. traders report to Mr. Davis on organizational charts (including those submitted to FINRA).

164.    Mr. Davis did not object to this plainly dishonest suggestion, but instead merely responded, "Needs to be very clear that you call the shots – no questions!"

165.    This exchange yet again displays Autonomous's blatantly cavalier attitude about misrepresenting reporting relationships to FINRA and other external parties, and its high tolerance for managing the Firm's operations without proper licenses in place for the responsible managers.

166.    These emails between Mr. Davis and Mr. Smart also further support Ms. Baskett's steadfast complaint that there is, in fact, no genuine reporting line between her and Mr. Davis, and that the Firm again simply asserted and fabricated a supposed reporting line in post-hoc fashion in order to survive FINRA's audit.

167.    Indeed, Autonomous's misrepresentations to FINRA regarding the supervision of traders are a typical example of its strategy throughout the audit to blatantly lie to auditors in the face of emails that clearly contradicted their representations.

168.    As another example, rather than explain to FINRA that Mr. Firkins nominally managed the U.S. office and that, as Mr. Graham announced in his email rolling out the restructuring, no one managed the U.S. office, Autonomous told FINRA that Mr. Davis somehow supervised day-to-day operations in the U.S. office from London.

169.    Autonomous has further misrepresented to FINRA that Ms. Baskett still reports to Mr. Davis, despite Mr. Crean's December 13, 2016 email expressly stating otherwise, and that Ms. Baskett merely maintains only so-called "functional" or "matrix" reporting lines to Mr. Firkins and Ms. Guthrie.  These contorted representations by the Firm further reveal how management tries to have it both ways – marginalizing Ms. Baskett on the one hand, so she stays out of the way of lax and profitable business practices that may not be compliant, while on the other hand, maintaining a fictional, on-paper reporting structure that can be pointed to for auditors.

170.    Notably, on August 22, 2017, FINRA issued Autonomous a "Cautionary Action" that confirmed that Autonomous's supervisory structure and practices regarding research reports, among other things, constituted "violations of securities rules and regulations."

171.     Additionally, shortly after the FINRA exam began, Ms. Baskett was informed that Ms. Guthrie would be taking an indefinite leave of absence from Autonomous, and that Mr. Firkins also, coincidentally, would be taking an extended leave from the Firm.

172.     Although Ms. Guthrie was in fact regularly communicating via email with other employees throughout her supposed "leave," she actively excluded Ms. Baskett from any communications.

173.     Furthermore, Ms. Guthrie and the Firm hid from Ms. Baskett the details regarding Ms. Guthrie's return to the office, until Ms. Baskett learned inadvertently through her routine email review that Ms. Guthrie was back in the London office, despite the fact that Ms. Baskett was told that Ms. Guthrie remained on medical leave.

174.     Furthermore, the Firm and Ms. Guthrie continue to lie about Ms. Guthrie's title and role, as illustrated by the fact that, to this day, Ms. Guthrie conspicuously is not listed as Global Head of Compliance on Autonomous's website.  Instead, Ms. Guthrie is listed merely as "Partner, Compliance Officer."

175.     Notably, Mr. Davis is listed as CEO, despite having been promoted to the position well after Ms. Guthrie was promoted to Global Head of Compliance.

176.     Further, in recent months the Firm has held regular meetings regarding the role of MiFID II and how the Firm will change its practices in response to it.  The main subject of these meetings is the compliance implications of MiFID II and, specifically, how the Firm will be able to take advantage of new opportunities presented by the updated U.K. regulations while avoiding exposure to violations and fines.

177.    These discussions have centered, in large part, on the Firm's selling research reports in accordance with MiFID II, but without regard to how its actions will result in noncompliance with U.S. securities laws.

178.    Needless to say, given that Ms. Baskett is charged with keeping the U.S. entity compliant, it is crucial that she be present for these meetings.

179.    And yet, with the exception of the first meeting, the Firm did not inform Ms. Baskett of various meetings on the subject.

180.    Further, Ms. Baskett has become aware that the minutes for many of these meetings suspiciously and falsely reflect that she was invited and either attended the meetings or declined the invite.

181.    When Ms. Baskett raised these issues with Mr. Davis, Mr. Firkins and Ms. Guthrie, they provided no assurance that she would be invited to future meetings.  The Firm did not even address the fraudulent nature of its minutes until weeks after Ms. Baskett first identified the misrepresentations.  Still, Mr. Davis only vaguely assured her someone would "look into" it.

182.    Ms. Baskett's complaints and insistence on the Firm's compliance with the SEC and FINRA were a contributing factor to her exclusion from important and necessary meetings.

183.    On or around November 15, 2017, Mr. Davis wrongfully accused Ms. Baskett of spreading negative rumors in the office.  When colleagues came to Ms. Baskett's defense, Mr. Davis adamantly rejected the idea that anyone other than Ms. Baskett could have spread the rumors.

184.    Despite the unfounded and openly hostile attack on her character, Ms. Baskett politely forwarded an email to Mr. Davis demonstrating that the negative rumor that he supposed

she was spreading had in fact originated in an email sent by an Autonomous board member, making it abundantly clear that she had not started or contributed to that rumor or conversation.

185.     Later that same day, during a call that Ms. Baskett participated in with Mr. Firkins, Ms. Guthrie, Peter Gosztonyi, James Barr and Brendan Murray, Mr. Firkins publicly berated Ms. Baskett and accused her of not understanding her role (which she has inhabited in one form or another for years, having helped build a great deal of the Firm's organizational and compliance structure).  On this call, Ms. Baskett asked a question of clarification concerning the interpretation of a U.K. rule so that she could appropriately apply the rule in the U.S.  Such questions should be expected, as Ms. Baskett has been deliberately excluded from various operationally important meetings and discussions to which she would have been privy before lodging her various protected complaints.

186.     Rather than answer Ms. Baskett's legitimate questions, Mr. Firkins condescendingly stated to Ms. Baskett, "I don't know how to make this more clear," and "I don't know why this is hard for you to understand."

187.     Ms. Baskett, who is fully and manifestly aware of her role and responsibilities at Autonomous, found these demeaning comments by Mr. Firkins not just unprofessional, but also transparently intended to undermine her image at the Firm and vent animus against her.

188.     Ms. Baskett has complained, either independently or through counsel, to the Firm regarding all of these retaliatory acts, yet they continue to this day, causing Ms. Baskett great distress and fear for her job, as well as harm to her professional reputation and career progression.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
### *Against Defendant Autonomous (i.e., both corporate Defendants)*

189.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

190.     Defendant Autonomous has discriminated against Plaintiff on the basis of her gender in violation of Title VII by, *inter alia*, unlawfully demoting Plaintiff and paying Plaintiff at a lesser rate than her comparable male colleagues.

191.     As a direct and proximate result of Defendant Autonomous's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

192.     As a direct and proximate result of Defendant Autonomous's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

193.     The unlawful discriminatory actions of Defendant Autonomous constitute malicious, willful and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

194.     Plaintiff also is entitled to her attorneys' fees and costs as a result of Defendant Autonomous's violations of Title VII.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
### *Against Defendant Autonomous*

195.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

196.    By the actions described above, among others, Defendant Autonomous retaliated against Plaintiff on the basis of her protected activities in violation of Title VII by, *inter alia*, demoting Plaintiff and later subjecting her to increased scrutiny and eliminating her job responsibilities.

197.    As a direct and proximate result of Defendant Autonomous's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

198.    As a direct and proximate result of Defendant Autonomous's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

199.    Defendant Autonomous's unlawful retaliatory actions constitute malicious, willful and wanton violation of Title VII, for which Plaintiff is entitled to an award of punitive damages.

200.    Plaintiff also is entitled to her attorneys' fees and costs as a result of Defendant Autonomous's violations of Title VII.

## THIRD CAUSE OF ACTION
### (Violations of the EPA)
### *Against Defendant Autonomous*

201.     Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs as though fully set forth herein.

202.     During the period of the employment of Plaintiff, Defendant Autonomous was subject to the provisions of the EPA.  During that time, Defendant Autonomous required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production or upon any factor other than gender.

203.     Defendant Autonomous engaged in patterns, practices and/or policies of employment that willfully, and, in the alternative, unwittingly, discriminated against Plaintiff on the basis of her gender, and by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions and at the same establishments.

204.     By the actions described above, among others, Defendant Autonomous violated the EPA.

205.     As a direct and proximate result of Defendant Autonomous's unlawful and discriminatory conduct in violation of the EPA, Plaintiff has suffered, and continues to suffer, harm, for which she is entitled to an award of monetary damages and other relief.

206.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the Sarbanes-Oxley Act)
### *Against All Defendants*

207.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

208.    As set forth above, Plaintiff made countless protected complaints to Defendants concerning, *inter alia*, violations of FINRA rules, violations of SEC regulations, tax fraud and fraud on Defendant Autonomous's owners and/or shareholders.

209.    Defendants violated the Sarbanes-Oxley Act by taking adverse employment actions against Plaintiff, including, but not limited to, retaliatorily harassing her, subjecting her to disparate monitoring and scrutiny of her work, demoting her and stripping away her supervisory responsibilities and authority.

210.    As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe financial, mental and emotional hardship and injury, including the loss of compensation, damage to her reputation, reduced possibilities for equivalent future compensation and other additional damages, including interest, attorneys' fees, costs and disbursements.

211.    Defendants' aforementioned conduct was in violation of laws and regulations, including the Sarbanes-Oxley Act, entitling Ms. Baskett to an award of damages in an amount to be established at trial, plus interest, attorneys' fees, costs and disbursements.

35

## FIFTH CAUSE OF ACTION
### (Violations of the EPL)
### *Against All Defendants*

212.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

213.    Throughout Plaintiff's employment, Defendants were subject to the EPL.  During the employment of Plaintiff, Defendants required Plaintiff to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiff at a rate of pay, including salary and bonus, less than such male employees.  The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production or upon a bona fide factor other than gender, such as education, training or experience.

214.    Defendants engaged in patterns, practices and/or policies of employment which willfully, and, in the alternative, unwittingly, discriminated against Plaintiff on the basis of her gender by paying Plaintiff a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which require equal skill, effort and responsibility, and under the same working conditions and at the same establishment.

215.    By the actions described above, among others, Defendants have violated the EPL.

216.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the EPL, Plaintiff has suffered, and continues to suffer, harm, for which she is entitled to an award of monetary damages and other relief.

217.    Plaintiff is further entitled to liquidated damages, reasonable costs and attorneys' fees.

## SIXTH CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
*Against all Defendants*

218.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

219.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by, *inter alia,* unlawfully demoting Plaintiff and paying Plaintiff at a lesser rate than her comparable male employees.

220.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm, for which she is entitled to an award of damages, to the greatest extent permitted under law.

221.    The individual Defendants are also liable under the NYSHRL because they aided and abetted the unlawful conduct.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
*Against all Defendants*

222.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

223.    By the actions described above, Defendants retaliated against Plaintiff by unlawfully materially changing the conditions of her employment because she made protected complaints regarding Defendants' unlawful and discriminatory treatment, including, *inter alia,* demoting Plaintiff and later subjecting her to increased scrutiny and eliminating her job responsibilities.

224.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### *Against Defendants Graham, Davis, Firkins and Guthrie*

225.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

226.     By the actions described above, among others, Defendants Graham, Davis, Firkins and Guthrie knowingly or recklessly aided and abetted the unlawful discriminatory and retaliatory conduct to which Plaintiff was subjected in violation of the NYSHRL.

227.     As a direct and proximate result of Defendants Graham's, Davis's, Firkins's and Guthrie's unlawful aiding and abetting in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm, for which she is entitled to an award of damages, to the greatest extent permitted under law.

## NINTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *Against all Defendants*

228.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

229.     By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by, *inter alia,* unlawfully demoting Plaintiff and paying Plaintiff at a lesser rate than her comparable male employees.

230.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

231.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### TENTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
***Against all Defendants***

232.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

233.     By the actions described above, Defendants retaliated against Plaintiff by unlawfully materially changing the conditions of her employment because she made protected complaints regarding Defendants' unlawful and discriminatory treatment, *inter alia,* demoting Plaintiff and later subjecting her to increased scrutiny and eliminating her job responsibilities.

234.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

235.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYCHRL)**
***Against Defendants Graham, Davis, Firkins and Guthrie***

236.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

237.    Defendants Graham, Davis, Firkins and Guthrie knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiff was subjected in violation of the NYCHRL.

238.    As a direct and proximate result of Defendants Graham's, Davis's, Firkins's and Guthrie's unlawful aiding and abetting in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, economic and emotional harm, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

239.    Defendants Graham, Davis, Firkins and Guthrie unlawful aiding and abetting constitutes malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that an award be issued in her favor containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering and emotional distress;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

F.      An award of punitive damages in an amount to be determined at trial;

G.      An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 24, 2017
      New York, New York

                                          Respectfully submitted,

                                          **WIGDOR LLP**

                                          By: _____
                                                  Lawrence M. Pearson
                                                  Kenneth D. Walsh
                                                  Kenneth D. Sommer
                                                Hilary J. Orzick

                                          85 Fifth Avenue
                                          New York, NY  10003
                                          Telephone:  (212) 257-6800
                                          Facsimile:   (212) 257-6845
                                          lpearson@wigdorlaw.com
                                          kwalsh@wigdorlaw.com
                                          ksommer@wigdorlaw.com
                                          horzick@wigdorlaw.com

                                          *Counsel for Plaintiff*