UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                            :

ERIN BASKETT,                   :
                            :

               Plaintiff,    :

                            :

       - against -         :

                            :

AUTONOMOUS RESEARCH LLP, et al.,  :

                            :

            Defendants.  :

                            :

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___9/28/2018___

17-CV-9237 (VSB)

**OPINION & ORDER**

Appearances:

Hilary Joy Orzick
Kenneth David Sommer
Kenneth Daniel Walsh
Lawrence Michael Pearson
Wigdor LLP
New York, New York
*Counsel for Plaintiff*

Andrew Marten Sherwood
Lloyd Blades Chinn
Andrew M. Schnitzel
Proskauer Rose LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

      Plaintiff Erin Baskett brings this action against Defendants Autonomous Research US,

LP ("Autonomous US"), Autonomous Research LLP ("Autonomous UK," and together with

Autonomous US, the "Firm"), Erickson Davis, Stuart Graham, Jonathan Firkins, and Samantha

Guthrie asserting employment discrimination and retaliation claims arising under Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., the Equal Pay Act of 1963,

29 U.S.C. § 206(d), the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.*, the

New York City Human Rights Law, N.Y. Admin. Code §§ 8-101, *et seq.*, the New York Equal

Pay Law, N.Y. Labor Law § 194, and the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. §

1514A.  Before me is Defendants' motion to dismiss under Federal Rules of Civil Procedure

12(b)(2), 12(b)(5), and 12(b)(6) for lack of personal jurisdiction, insufficient service of process,

and failure to state a claim or, in the alternative, for summary judgment.  (Doc. 57.)  Also before

me is Defendants' motion to strike Plaintiff's response to Defendants' Rule 56.1 statement and

statement of additional material undisputed facts, (Doc. 70), and Defendants' motion for

sanctions, (Doc. 78).  For the reasons stated herein, Defendants' motion to dismiss or, in the

alternative, for summary judgment is GRANTED IN PART and DENIED IN PART,

Defendants' motion to strike is DENIED, and Defendants' motion for sanctions is DENIED.

## I.    **Background**[1]

The Firm is a financial research company that was founded in London in 2012.  (Am.

Compl. ¶ 1.)[2]  Plaintiff joined the Firm in August 2012 and was one of three individuals

designated as the "Managing/Founding partners who were responsible for launching the United

States office of Autonomous, located in New York City."  (*Id.* ¶¶ 26–27.)  Plaintiff is currently a

salaried partner at Autonomous US.  (*Id.* ¶ 17.)

As part of her duties and responsibilities before the official launch of the New York City

office in December 2012, Plaintiff set up a compliance monitoring structure for the Firm, hired

---

[1] Defendants' motion to dismiss is made pursuant to Rule 12 or, in the alternative, under Rule 56.  Plaintiff and Defendants each submitted materials outside of the pleadings.  Because I deny Defendants' request for relief under Rule 56, *see infra* Part IV.A, I only consider the sufficiency of the Amended Complaint under Rule 12.  Therefore, I assume Plaintiff's allegations contained in the Amended Complaint, (Doc. 50), to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.  I summarize only those facts necessary to rule on the pending motions.

[2] "Am. Compl." refers to Plaintiff's Amended Complaint, filed on February 16, 2018.  (Doc. 50.)

staff and ensured that the Firm was fully compliant with applicable Securities and Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA") rules, regulations, and standards. (*Id.* ¶ 29.) In 2014, Plaintiff oversaw compliance and audits for the Firm's London headquarters, and throughout 2015 she was in charge of compliance globally. (*Id.* ¶¶ 32, 35.)

Despite her integral contributions to the Firm, Plaintiff consistently received lower pay than her comparable male colleagues. (*Id.* ¶¶ 41, 45, 47.) Plaintiff first complained about the pay disparity in early 2013, when she spoke with Graham (the Firm's former Chief Executive Officer ("CEO")) and Firkins (a Managing Partner and Global Chief Financial Officer of the Firm's London office), who dismissed her claims. (*Id.* ¶¶ 22, 24, 48.)

In early 2014, Davis was promoted from lead salesman to Deputy CEO, despite the fact that he did not have the required licenses under federal and industry regulations to complete his new job functions. (*Id.* ¶¶ 70, 72.) As a result, Plaintiff "repeatedly voiced her concerns about, and objected to, this noncompliant state of affairs to senior management [and] also raised various other concerns that she reasonably believed constituted regulatory violations that began creeping up." (*Id.* ¶ 77.) Plaintiff also complained to Firm leadership regarding "improper disclaimers that incorrectly reflected the global registrations of broker-dealers and the Firm's failure to follow various regulations, including securities regulations administered and enforced by FINRA and the SEC," (*id.* ¶ 79), and "expressed concern regarding Autonomous's failure to file Firm registrations and report personal outside business interests, which are a source of potential conflicts, with regulatory agencies," (*id.* ¶ 81). Plaintiff lodged additional complaints regarding the Firm's packaging of certain research reports as sales commentaries, in violation of FINRA rules. (*Id.* ¶¶ 127–36.)

In late 2015, the Firm's London headquarters began to pursue a global "restructuring." (*Id.* ¶ 87.) As part of the restructuring, the Firm "decided that one of [Plaintiff's] direct subordinates, Samantha Guthrie, who did not and still does not hold the requisite license, should be given the role of Global Head of Compliance instead of and over [Plaintiff], despite [Plaintiff] having held the title until that point." (*Id.* ¶ 88.) "The Firm's supplanting of [Plaintiff] with Ms. Guthrie was a clear demotion, and was intended to send a message to [Plaintiff] to cease what Firm leadership saw as her compliance complaints' hindering of Firm business." (*Id.* ¶ 94.) Since the global restructuring in April 2016, Plaintiff has continued to speak out regarding the Firm's regulatory violations and, in response, the Firm has continued to take various retaliatory actions against her. (*Id.* ¶¶ 108–11, 127–36.)

## II.     Procedural History

Plaintiff filed her complaint on November 24, 2017. (Doc. 1.) Autonomous US, Davis, and Graham filed a motion to dismiss the complaint on January 26, 2018, (Doc. 29), Autonomous UK and Firkins filed a motion to dismiss the complaint on February 9, 2018, (Doc. 44), and Guthrie filed a motion to dismiss the complaint on February 14, 2018, (Doc. 46).

On February 16, 2018, Plaintiff filed her Amended Complaint. (Doc. 50.) On March 13, 2018, Defendants filed their motion to dismiss the Amended Complaint or, in the alternative, for summary judgment, along with their supporting materials. (Docs. 57–60.) On May 4, 2018, Plaintiff filed her opposition, along with her materials in support of her opposition, (Docs. 66–68, 76), and on May 23, 2018, Defendants filed their reply and materials in further support of their motion, (Docs. 80–81).

On May 11, 2018, Defendants filed their motion to strike Plaintiff's responsive Rule 56.1 statement, along with their supporting papers. (Docs. 70–71.) On May 25, 2018, Plaintiff filed

her opposition, (Doc. 82), and on June 1, 2018, Defendants filed their reply, (Doc. 83).

On May 23, 2018, Defendants filed their motion for sanctions, and papers in support. (Docs. 78–79.) On June 7, 2018, Plaintiff filed her opposition, along with her papers in support, (Docs. 86–88), and on June 14, 2018, Defendants filed their reply and supporting papers, (Docs. 89–91).

### III. <u>Legal Standards</u>

#### A. *Rule 12(b)(2)*

When a defendant moves for dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. *Kernan v. Kurz– Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999). On a motion under Rule 12(b)(2), when the issue of personal jurisdiction "is decided initially on the pleadings and without discovery, the plaintiff need show only a *prima facie* case." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). A plaintiff "can make this showing through [her] own affidavits and supporting materials[] containing an averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant." *Whitaker v. Am. Telecasting Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal citations and quotation marks omitted). Thus, a court may consider materials outside the pleadings. *Hsin Ten Enter. USA, Inc. v. Clark Enters.*, 138 F. Supp. 2d 449, 452 (S.D.N.Y. 2000).

In determining whether personal jurisdiction has been established, courts engage in a two-step analysis. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). First, courts must determine if there is statutory jurisdiction, and second, "[i]f there is a statutory basis for jurisdiction, the court must then determine whether . . . extension of jurisdiction in such a case would be permissible under the Due Process

Clause of the Fourteenth Amendment." *Id.*

## B. *Rule 12(b)(5)*

Rule 12(b)(5) authorizes a court to dismiss a complaint for insufficient service of process prior to a defendant filing an answer. *See* Fed. R. Civ. P. 12(b)(5). "In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010). When an individual is served in a foreign country, the plaintiff must show that service was made in accordance with Rule 4(f).

Once a defendant moves to dismiss pursuant to Rule 12(b)(5), the plaintiff bears the burden of establishing that service was adequate. *See Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (summary order). Courts may look to materials outside of the pleadings when determining whether service was sufficient. *See Darden v. DaimlerChrysler N. Am. Holdings Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002).

## C. *Rule 12(b)(6)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences

unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

### D.    *Rule 56*

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists. *Id.* at 256. If satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.*, and to present such evidence that would allow a jury to find in her favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Additionally, in considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

"Although a pre-discovery motion [for summary judgment] is permitted under Federal Rule of Civil Procedure 56, it should be granted 'only in the rarest of cases' because 'the nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment.'" *Lifetree Trading PTE., LTD. v. Washakie Renewable Energy, LLC*, No. 14-CV-9075 (JPO), 2015 WL 3948097, at *6 (S.D.N.Y. June 29,

2015) (quoting *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000)). If the non-moving party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it." Fed. R. Civ. P. 56(d); *see also Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303–04 (2d Cir. 2003).

## IV.   <u>Discussion</u>

Defendants argue that (1) Plaintiff is not an "employee" entitled to bring suit under the employment anti-discrimination and retaliation laws she invokes; (2) Plaintiff's SOX claims against all Defendants should be dismissed because Plaintiff fails to allege that she made complaints that relate to fraud by a public company or fraud that affects a public company's shareholders; (3) Plaintiff's claims against Autonomous UK and Firkins (the "UK Defendants") should be dismissed for lack of personal jurisdiction; (4) Plaintiff's claims against the UK Defendants should be dismissed for failure to comply with the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention"); and (5) Plaintiff's claims against Guthrie should be dismissed because Guthrie cannot be held individually liable under the relevant statutes.[3]  I address these arguments in turn below.[4]

---

[3] Because I dismiss Plaintiff's SOX claims against all Defendants, *see infra* Part IV.B, and because Plaintiff does not oppose Defendants' motion to dismiss Plaintiff's remaining claims against Guthrie, (Pl.'s Opp. 37), all of Plaintiff's claims against Guthrie are dismissed.  "Pl.'s Opp." refers to the Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment, filed on May 4, 2018.  (Doc. 67.)

[4] Although issues related to personal jurisdiction and service constitute threshold inquiries that are ordinarily discussed prior to the merits of substantive claims, "that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013).  Because not all defendants move for lack of personal jurisdiction and failure of service, I address the personal jurisdiction and service questions after I address the merits of the substantive claims.  *See id.*; *see also Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012) ("However, in cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the

## A.    *Plaintiff's Employee Status*

Defendants move for pre-discovery summary judgment, arguing that they are entitled to relief on the basis of a single question:  whether Plaintiff is an "employee" within the meaning of the employment laws under which she raises her claims.  Because of Plaintiff's status as a partner at the Firm, Defendants contend that Plaintiff cannot be considered an "employee" under the relevant statutes.  (Defs.' Mem. 13–29.)[5]  Plaintiff asks me to defer a final ruling on the summary judgment motion and to order targeted Rule 56(d) discovery, or to deny the motion. (Pl.'s Opp. 16–30.)

### 1.   Applicable Law

The determination of whether an individual is an "employee" under applicable anti-discrimination laws is a "fact-intensive" inquiry that "depends on all of the incidents of the relationship with no one factor being decisive."  *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 451 (2003) (internal quotation marks omitted).  The "common-law element of control" serves as the "principal guidepost" for determining whether an individual is an employer to whom employment discrimination statutes do not apply, as opposed to an employee who can assert claims under those statutes.  *Id.* at 448.  In *Clackamas*, the Supreme Court enumerated six non-exclusive factors that courts should consider when determining whether an individual is an employee of an organization, including:  (1) "Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work"; (2) "Whether and, if so, to what extent the organization supervises the individual's work"; (3) "Whether the individual reports to someone higher in the organization";  (4) "Whether and, if so, to what

---

personal jurisdictional claims made by some defendants.")

[5] "Defs.' Mem." refers to Defendants' Renewed Memorandum of Law in Support of Their Motion to Dismiss or, in the Alternative, for Summary Judgment, filed on March 13, 2018.  (Doc. 58.)

extent the individual is able to influence the organization"; (5) "Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts"; and (6) "Whether the individual shares in the profits, losses, and liabilities of the organization." *Id.* at 449–50 & n.10 (internal quotation marks omitted). The Supreme Court has made clear that "the mere fact that a person has a particular title—such as partner, director, or vice president—should not necessarily be used to determine whether he or she is an employee or a proprietor" and "the mere existence of a document styled," for example, as an "employment agreement," or a partnership agreement, does not necessarily answer the question. *Id.* at 450.

## 2. Application

In support of their position that Plaintiff constitutes an "employer" under *Clackamas*, Defendants rely heavily on the Firm's Original Partnership Agreement and the Restructured Partnership Agreement, among other Firm documents submitted with their motion, to argue that Plaintiff exerts substantial influence over the Firm through the exercise of voting rights, has broad discretion over her work with little to no supervision, shares in the profits and losses of the Firm, and does not report to any of her co-owners. In response, Plaintiff—consistent with Rule 56(d)—submitted an affidavit, along with an affidavit from her counsel, identifying areas of discovery necessary to adequately respond to Defendants' factual representations. In particular, Plaintiff asserts that discovery would reveal that the Firm's original and restructured partnership agreements are neither operative nor adhered to, that Plaintiff has little control or decision-making ability within the Firm, and is unable to make significant decisions without the approval of one of her supervisors. (Baskett Decl. ¶¶ 6, 10.)[6] Moreover, Plaintiff claims that the hiring,

---

[6] "Baskett Decl." refers to the Declaration of Erin Baskett in Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, filed on May 5, 2018. (Doc. 68.)

firing, and status-change of partners is determined by a small subset of partners—the Executive Committee, of which she is not a member. (*Id.* ¶¶ 12, 15, 79.) Plaintiff also disputes Defendants' contentions that Plaintiff has made any capital contribution to the firm, holds an unconditional ownership stake in the Firm, or has unparalleled access to confidential Firm information. (*Id.* ¶¶ 17, 18, 30, 49, 73.) I also note that Plaintiff describes how her responsibilities, reporting hierarchy, and compensation changed over time, (*id.* ¶¶ 11–14, 21–22, 51, 54), and asserts that aspects of her employment agreement are inconsistent with Defendants' claims that she is more than an employee, (*id.* ¶¶ 40, 69–72).

Considering the Supreme Court's directive to consider the *Clackamas* factors in light of all relevant facts, courts have declined to grant pre-discovery summary judgment where, as here, a plaintiff has, under Rule 56(d), identified areas that require factual development. *See Campbell v. Chadbourne & Parke LLP*, No. 16-CV-6832 (JPO), 2017 WL 2589389, at *3 (S.D.N.Y. June 14, 2017) (concluding that summary judgment was not appropriate and denying defendants' motion without prejudice to renewal following limited discovery relating to the *Clackamas* factors); *see also Foresta v. Centerlight Capital Mgmt., LLC*, 379 F. App'x 44, 46 (2d Cir. 2010) (summary order) (holding that "the District Court erred in granting summary judgment without first permitting plaintiff to take additional discovery" regarding a set of factors similar to the *Clackamas* factors in the Americans with Disabilities Act context).[7] Accordingly, I conclude that summary judgment is not appropriate at this juncture and deny Defendants' motion without

---

[7] Defendants also move for summary judgment with regard to Plaintiff's Title VII claims, asserting that the Firm has only twelve employees and is thus not covered by Title VII. (Defs.' Mem. 29.) Title VII applies to an employer "engaged in an industry affecting commerce who has fifteen or more employees." 42 U.S.C. § 2000e(b). The number of individuals employed by the Firm as "employees" for the purpose of Title VII is in dispute as Plaintiff contends that certain individuals at the Firm with the title of partner, like herself, constitute employees. (Baskett Decl. ¶ 7.) Because the determination of the number of employees employed by the Firm also turns on an analysis under *Clackamas*, *see, e.g.*, *Fitzgibbons v. Putnam Dental Assocs., P.C.*, 368 F. Supp. 2d 339, 342–43 (S.D.N.Y. 2005), Defendants' motion for summary judgment is denied on this ground with leave to refile following discovery relating to the *Clackamas* factors.

prejudice to renewal following discovery relating to the *Clackamas* factors.[8]

### B. Sarbanes-Oxley Act Claims

### 1. Applicable Law

"To safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation, Congress enacted the Sarbanes-Oxley Act of 2002." *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014). Section 806 of SOX "protects employees who provide information, which the employee 'reasonably believes constitutes a violation' of any SEC rule or regulation or 'Federal law relating to fraud against shareholders.'" *Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006) (citing 18 U.S.C. § 1514A(a)(1)). To state a claim arising under SOX's whistleblower provision, a plaintiff must allege that "(1) he engaged in protected activity; (2) the employer knew of the protected activity; (3) he suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action." *O'Mahony v. Accenture*

---

[8] Because I find Defendants' motion for summary judgment to be premature at this stage, Defendants' request to strike Plaintiff's response to Defendants' Rule 56.1 statement—upon which I do not rely for purposes of this motion—is denied as moot. *See Thyssenkrupp Materials N.A., Inc. v. W. Bulk Carriers A/S*, 27 F. Supp. 3d 400, 409 (S.D.N.Y. 2014) ("Because the Court considers the motion for summary judgment premature as to the contract claim, [plaintiff's] request to strike [defendant's] reply papers—specifically, factual allegations contained in a reply Rule 56.1 Statement and two arguments relating to the terms of the charter party—is denied as moot.").

Relatedly, Defendants' motion for sanctions is denied. Defendants ask me to preclude Plaintiff from using in this litigation certain emails and documents she allegedly improperly obtained outside of the litigation process through her position as a compliance officer at the Firm. (*See generally* Doc. 79.) Courts have the ability to limit the use of evidence because of the manner in which the information was obtained based on their "inherent equitable power over their own process to prevent abuses, oppression, and injustices." *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 325 (S.D.N.Y. 1997) (internal quotation marks omitted). "A court considering the appropriate sanction to impose on a party that has wrongfully obtained evidence should weigh two factors: the severity of the wrongdoing and the prejudice to the adversary." *Id.* I do not rely on the disputed emails for purposes of this motion and Defendants have therefore not been prejudiced by Plaintiff's inclusion of them in her papers. Moreover, while Plaintiff's conduct was possibly improper it was not so severe as to rise to the level of sanctionable conduct. *Cf. id.* (imposing sanctions where plaintiff broke into employer's office and copied confidential documents without permission); *Lipin v. Bender*, 644 N.E.2d 1300, 1304 (N.Y. 1994) (approving implementation of sanctions where, during pretrial conference, plaintiff removed from counsel table a stack of confidential papers belonging to opposing counsel, read them, and provided a copy to her attorney). I note, as Defendants acknowledge, that many if not all of the documents Plaintiff allegedly improperly obtained outside of the litigation process were documents she legitimately had access to as a compliance officer at the Firm.

*Ltd.*, 537 F. Supp. 2d 506, 510 (S.D.N.Y. 2008) (quoting *Fraser*, 417 F. Supp. 2d at 322).  To

qualify as a covered employer subject to suit under SOX, a company must either:  (i) have "a

class of securities registered under section 12 of the Securities Exchange Act of 1934"; (ii) be

"required to file reports under section 15(d) of the Securities Exchange Act of 1934 . . . including

any subsidiary or affiliate whose financial information is included in the consolidated financial

statements of such company"; (iii) be a "nationally recognized statistical rating organization"; or

(iv) be an "officer, employee, contractor, subcontractor, or agent of [a publicly traded company]

or nationally recognized statistical rating organization."  18 U.S.C. § 1514A; *see also Tellez v.*

*OTG Interactive, LLC*, No. 15 CV 8984-LTS, 2016 WL 5376214, at *2 (S.D.N.Y. Sept. 26,

2016).

## 2.  Application

In moving to dismiss Plaintiff's SOX claims, Defendants argue that they do not constitute

covered entities under SOX because they do not qualify under the statute as "'contractors' of any

public company."[9]  (*See* Doc. 30 at 29.)  In response, Plaintiff contends that her allegations

support an inference that Defendants are covered entities under SOX's whistleblower protections

as the Firm is a contractor for publicly traded companies and the individuals are officers or

employees of the Firm.  (Pl.'s Opp. 33.)  I agree with Defendants.

In *Lawson v. FMR LLC*, the Supreme Court addressed the application of SOX's

"contractor, subcontractor or agent" language.  571 U.S. 429.  In that case, two former

employees brought lawsuits alleging unlawful retaliation against their private company

employers that provided investment advising services to a family of mutual funds.  *Id.* at 433.

---

[9] Defendants assert, and Plaintiff does not contest, that Defendants do not fall within the first three categories of
employers covered by 15 U.S.C. § 1514A.  (*See* Doc. 30 at 28; Pl.'s Opp. 31–35.)

The mutual funds were public companies, had no employees, and had contracted with defendants to provide advisory services. *Id.* The plaintiffs' suit stemmed from allegations of fraud relating directly to the mutual funds. *Id.* In finding that SOX's whistleblower protection extended to the plaintiffs, the Supreme Court analyzed SOX's "contractor" provision. *Id.* That analysis is instructive here.

In reaching its decision, the Supreme Court emphasized SOX's overarching goal of preventing future fraud by public companies, as well as the unusual structure of mutual funds (which generally have no employees). In particular, the Supreme Court noted:

> In the Enron scandal that prompted [SOX], contractors and subcontractors . . . participated in Enron's fraud and its coverup. When employees of those contractors attempted to bring misconduct to light, they encountered retaliation by their employers. [SOX thus] contains numerous provisions aimed at controlling the conduct of accountants, auditors, and lawyers who work with public companies.

*Id.* at 434. The Supreme Court found that given Congress' clear "concern about contractor conduct of the kind that contributed to Enron's collapse," it "regard[ed] with suspicion construction of § 1514A to protect whistleblowers only when they are employed by a public company, and not when they work for the public company's contractor." *Id.* Therefore, the Supreme Court held that finding the *Lawson* plaintiffs to be covered under SOX furthered the statute's goal of preventing publicly-held companies from utilizing outside contractors to perpetuate fraud on shareholders.

Since *Lawson*, federal courts that have addressed the scope of § 806's "contractor" provision have found that it does not cover situations where, as here, the plaintiff employee does not allege fraud related to or engaged in by a public company. In other words, the contractor provision does not apply where a public company has no involvement in the conduct Congress sought to curtail by passing SOX. For instance, in *Gibney v. Evolution Marketing Research,*

*LLC*, an employee sued his former employer, a private contractor of a public company, after the employer allegedly fired him for complaining that the employer was overbilling a publicly traded company for which it provided marketing services. 25 F. Supp. 3d 741, 742 (E.D. Pa. 2014). The court held that the allegations failed to state a claim, concluding that plaintiff was "advocat[ing] for an impermissibly broad definition of SOX protection that was neither intended by Congress nor contemplated by the Supreme Court in *Lawson*." *Id.* at 747 (noting that the case "does not implicate the peculiar structure of the mutual fund industry" and that denying plaintiff coverage would not "'insulate' an entire industry from § 1514A protection"). In particular, the court found that "[n]othing in the text of § 1514A or the *Lawson* decision suggests that SOX was intended to encompass every situation in which any party takes an action that has some attenuated, negative effect on the revenue of a publicly-traded company, and by extension decreases the value of a shareholder's investment." *Id.* at 747–48 ("Plaintiff has not alleged that he blew the whistle on fraud committed by Merck (either acting on its own or acting through contractors like [defendant]). Rather, [p]laintiff is alleging that [defendant] committed fraud against Merck. Thus, based on Plaintiff's allegations, Merck is the victim of fraud rather than its perpetrator."). Numerous other courts have reached similar conclusions. *See, e.g.*, *Brown v. Colonial Sav. F.A.*, No. 4:16-CV-884-A, 2017 WL 1080937, at *4 (N.D. Tex. Mar. 21, 2017) (relying on *Lawson* and *Gibney* and concluding that "Plaintiff's allegations of fraud are too far removed from potentially harming the shareholders of a public company to be covered under § 1514A"); *Reyher v. Grant Thornton, LLP*, 262 F. Supp. 3d 209, 217 (E.D. Pa. 2017) (dismissing SOX claim, finding that the "purported whistleblower employed by a private company cannot invoke the protections of section 1514A simply because her employer happens to contract with public companies on matters unrelated to the alleged whistleblowing"); *Anthony*

*v. Nw. Mut. Life Ins. Co.*, 130 F. Supp. 3d 644, 652 (N.D.N.Y. 2015) (finding that "§ 1514A only covers contractors insofar as they are firsthand witnesses to corporate fraud at a public company").

Plaintiff's allegations do not concern retaliation based on her reports of fraud by any public company or fraud on a public company's shareholders. Rather, Plaintiff's allegations concern her complaints regarding the potential regulatory risk caused by the Firm's supposed failure to follow SEC and FINRA rules pertaining to supervision, and claims that the Firm failed to include the correct disclaimers on certain reports. (Am. Compl. ¶¶ 79–86, 127–65; *see also* Pl.'s Opp. 34–35 (describing Plaintiff's pleadings as complaining that Defendants' research materials were "not subjected to the requisite rigorous supervisory review, and were therefore not compliant with SEC regulations" and that "the Firm's reporting and supervisory structure itself did not comply with FINRA and SEC oversight requirements").) These complaints concern the Firm and its internal structure rather than fraud committed by a public company or on its shareholders. As the court in *Anthony* explained, the "effect of [SOX's] limitations is to restrict § 1514A to situations where a contractor employee is functionally acting as an employee of a public company, and in that capacity, is a witness to fraud by the public company." 130 F. Supp. 3d at 652. Based upon the allegations in the Amended Complaint, that is not the case here.

Accordingly, I find that Plaintiff has failed to allege that she made complaints relating to fraud committed by a public company or fraud that affects a public company's shareholders and, as such, her SOX claims against Defendants must be dismissed.

## C. *Personal Jurisdiction Over the UK Defendants*

Defendants argue that this Court lacks personal jurisdiction over the UK Defendants. Plaintiff argues that Autonomous UK is subject to both general and specific jurisdiction, and that Firkins is subject to specific jurisdiction. I find that Plaintiff has sufficiently alleged facts

demonstrating that the Court has specific jurisdiction over both Autonomous UK and Firkins.[10]

## 1. Applicable Law

When evaluating questions of personal jurisdiction, federal courts ordinarily follow the law of the state in which they are located. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). New York Civil Practice Law and Rules ("CPLR") §§ 301 and 302 set forth the requirements for establishing general and specific jurisdiction in New York, respectively.

General jurisdiction "permits a court to adjudicate any cause of action against the defendant, wherever arising, and whoever the plaintiff." *Lebron v. Encarnacion*, 253 F. Supp. 3d 513, 516 (E.D.N.Y. 2017). In *Daimler*, the Supreme Court confirmed that, consistent with due process, a corporation may be subject to general jurisdiction "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render it essentially at home in the forum State.'" 571 U.S. at 122 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Under § 301 of the CPLR, New York subjects a foreign corporation to general jurisdiction if it is "doing business" in the state, meaning that a corporation's "place of incorporation [or] principal place of business" is located in the state, *Daimler*, 571 U.S. at 137.

Under § 302 of the CPLR, New York's "long-arm" statute, a court may exercise specific jurisdiction over a non-domiciliary. *King Cty., Wash. v. IKB Deutsche Industriebank AG*, 712 F. Supp. 2d 104, 111 (S.D.N.Y. 2010); *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (N.Y. 2007). Jurisdiction is authorized if the non-domiciliary:

> [1] transacts any business within the state or contracts anywhere to supply goods or services in the state; or [2] commits a tortious act within the state . . . ; or [3] commits a tortious act without the state causing injury to person or property within

---

[10] Because I dismiss Plaintiff's claims as to Guthrie, *see supra* note 3, I only analyze Defendants' jurisdictional arguments as they pertain to Autonomous UK and Firkins.

the state . . . , if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or [4] owns, uses or possesses any real property situated within the state.

CPLR § 302(a).

In determining whether a defendant "transacts any business" within the state under § 302(a)(1), "a court must decide (1) whether the defendant 'transacts any business' in New York, and, if so (2) whether this cause of action 'arises from' such a business transaction." *Licci v. Lebenese Canadian Bank*, 673 F.3d 50, 60 (2d Cir. 2012) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)); *see also D & R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 297 (N.Y. 2017) (observing that personal jurisdiction exists if both:  (i) the defendant "purposefully availed itself of the privilege of conducting activities within" New York, and (ii) the plaintiff's claim "arise[s] from that business transaction" (internal quotation marks omitted)).

Section 302(a)(3)(ii) permits personal jurisdiction "over a[] non-domiciliary defendant who commits a tortious act outside of New York that causes injury in New York, where the defendant (1) should reasonably expect its actions to have consequences in New York and (2) derives substantial revenue from interstate or international commerce." *Bassili v. Chu*, 242 F. Supp. 2d 223, 229 (W.D.N.Y. 2002) (citing N.Y. C.P.L.R. § 302(a)(3)(ii)).  The first prong of this standard is a "foreseeability" standard that "relates to forum consequences generally and not to the specific event which produced the injury within the state." *Litton v. Avomex Inc*., No. 08-CV-1340 (NAM/DRH), 2010 WL 160121, at *8 (N.D.N.Y. Jan. 14, 2010) (internal quotation marks omitted); *see also City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 426 (E.D.N.Y. 2007) ("[T]o satisfy the first element of CPLR 302(a)(3) the plaintiff . . . need

only establish that the out-of-state conduct attributable to each defendant gives rise to a claim in tort."); *Fantis Foods, Inc. v. Standard Importing Co*., 402 N.E.2d 122, 125 n.4 (N.Y. 1980). The second prong requires "a prima facie showing that defendants derive substantial revenue from interstate or international commerce, [and] does not require any direct contact with New York." *Bassili*, 242 F. Supp. 2d at 230; *Ingraham v. Carroll*, 687 N.E.2d 1293, 1296 (N.Y. 1997).

Even where New York's long-arm statute allows for personal jurisdiction, federal courts consider "whether the exercise of this jurisdiction comports with federal due process." *Bank Brussels Lambert*, 305 F.3d at 127. Because the New York long-arm statute is more restrictive than the federal due process requirements, courts generally find that by virtue of satisfying the long-arm statute, the minimum contacts and reasonableness requirements of due process will also be satisfied. *See, e.g*., *Chatwal Hotels & Resorts LLC v. Dollywood Co*., 90 F. Supp. 3d 97, 108 (S.D.N.Y. 2015).

### 2. Application

#### a. Specific Jurisdiction Over Autonomous UK

Defendants contend that the Court lacks specific jurisdiction because Plaintiff has not pled specific facts regarding actions taken by Autonomous UK in New York and alleges no direct contact between Autonomous UK and New York. Plaintiff contends that Autonomous UK and its employees conducted substantial business in New York and that such activities were related to Plaintiff's claims. Defendants' contention misses the mark, and I find that Plaintiff's allegations support an inference that Autonomous UK is subject to jurisdiction under CPLR § 302(a)(3)(ii). Under the first prong of that section, Plaintiff alleges that Autonomous UK knew that the effects of any business-related conduct, including the allegedly discriminatory and retaliatory conduct against Plaintiff, would be felt by Plaintiff in New York, where she is located.

(Am. Compl. ¶¶ 1, 3, 27–39, 52; Baskett Decl. ¶¶ 47, 49, 64); *see also Litton*, 2010 WL 160121, at *6 ("When a person is employed in New York (or performs a substantial part of the duties of his employment in New York), his experience of being [discriminated or retaliated against] is a New York event that constitutes the first effect of the tort." (internal quotation marks omitted)). Regarding the second prong, Plaintiff has alleged that Autonomous UK conducts substantial international business, is headquartered in the United Kingdom, and has additional locations in both New York and Hong Kong. (*See* Am. Compl. ¶¶ 18–21; *see also* Baskett Decl. ¶ 4.) These allegations support an inference that Autonomous UK should have expected that its allegedly discriminatory and retaliatory conduct would have consequences in New York, and that it conducts substantial international business. *See Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Or., Inc.*, 156 F. Supp. 3d 348, 357 (E.D.N.Y. 2016) ("[T]he situs of the injury inflicted upon [defendant] was in New York because [the defendant's] financial loss occurred there."); *777388 Ontario Ltd. v. Lencore Acoustics Corp.*, 142 F. Supp. 2d 309, 324 (E.D.N.Y. 2001) (holding that defendant was subject to personal jurisdiction in New York where it "knew that [its] conduct would harm [the plaintiff] and its business relationships in New York").

Accordingly, I find that Plaintiff has alleged sufficient facts for me to conclude that the Court has specific jurisdiction over Autonomous UK.[11]

### b. Specific Jurisdiction Over Firkins

Regarding the first prong, a non-domiciliary purposefully avails himself of the privilege of conducting business in New York when he "seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship." *D & R Glob.*

---

[11] Because I find that I have specific jurisdiction over Autonomous UK, I do not address Plaintiff's argument that the Court also has general jurisdiction over Autonomous UK.

*Selections*, 29 N.Y.3d at 298 (internal quotation marks omitted). "Proof of one transaction in New York is sufficient to invoke jurisdiction pursuant to Section 302(a)(1), even though a defendant never enters New York." *Williams v. Preeminent Protective Servs., Inc*., 81 F. Supp. 3d 265, 271 (E.D.N.Y. 2015). Regarding the second prong, a plaintiff's claim is sufficiently related to the defendant's purposeful transaction with New York where there is "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." *D & R Glob. Selections*, 29 N.Y.3d at 299 (internal quotation marks omitted).

Plaintiff's allegations support an inference that Firkins conducted substantial business in New York and that such activities were related to Plaintiff's claims. As an initial matter, when Plaintiff joined the Firm in August 2012 and was involved in opening the United States office of Autonomous in New York City, Firkins and Davis directed her to sign the Firm's New York office lease. (Baskett Decl. ¶¶ 26–27, 64.) Plaintiff also alleges that Firkins delegated day-to-day responsibilities to Plaintiff and that Plaintiff communicated with Firkins by telephone and email routinely. (*See id.* ¶¶ 28, 34–35, 37–38, 47, 53; *see also* Am. Compl. ¶¶ 64, 85–86, 98–106, 122–24, 133–34, 138–48, 177–83, 186–88.) Moreover, Plaintiff alleges that communications from Firkins to Plaintiff demonstrate and/or support that she was subject to retaliatory and discriminatory conduct. (*See* Pearson Decl. Exs. 4, 12 (citing emails describing supposedly unnecessary and retaliatory heightened scrutiny and supervision); *see also* Am. Compl. ¶¶ 137–39.)[12] In other words, Firkins' conduct is directly connected to Plaintiff's causes of action.

---

[12] "Pearson Decl." refers to the Declaration of Lawrence M. Pearson in Opposition to Defendants' Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment, filed on May 4, 2018. (Doc. 66.)

These allegations support an inference that Firkins transacts sufficient business in New York and that his contacts with New York are related to Plaintiff's claims against Defendants. *See Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 358–59 (S.D.N.Y. 2007) (finding that communications via telephone and email with plaintiff who worked from home in New York were "sufficient to demonstrate purposeful transaction of business that has a substantial nexus to [p]laintiff's employment discrimination cause of action, within the meaning of section 302(a)(1)"); *see also Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 155 (E.D.N.Y. 2014) (finding that defendant's telephone calls and emails demonstrated that he "projected himself into New York in such a manner that he purposefully availed himself of the privilege of conducting activities in New York and thereby invoked the benefits and protections of its laws" (internal quotation marks omitted)); *Stamper v. Tech, Inc. v. 3DCD, LLC*, No. 11-CV-6152-CJS, 2012 WL 12875287, at *4 (W.D.N.Y. July 11, 2012) (concluding that out-of-state defendant was subject to jurisdiction in New York because "Defendant made telephone calls and sent emails to [p]laintiff in New York while negotiating [a] contract"). Contrary to Defendants' assertions, it is "clear that the physical presence, in this cellular and digital age, is not necessary" to establish jurisdiction, *Toledo Peoria & W. Ry. Corp. v. S. Ill. Railcar Co.*, 84 F. Supp. 2d 340, 343 (N.D.N.Y. 2000); *see also Uniroyal, Inc. v. Heller*, 65 F.R.D. 83, 91 (S.D.N.Y. 1974) ("The non-domiciliary defendant need not have been physically present in New York to have transacted business for purposes of CPLR § 302(a)(1)."); *cf. V Cars, LLC v. Israel Corp.*, 902 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (finding exchange of emails, among other conduct, insufficient to establish personal jurisdiction where parties never intended to do business but only participated in exploratory business meetings).

Therefore, I find that Firkins is subject to specific personal jurisdiction in New York

under the "transacting business" prong of the long-arm statute.

c. Due Process

In determining whether the exercise of jurisdiction comports with due process considerations, courts consider: "(1) the minimum contacts inquiry, and (2) the reasonableness inquiry." *Allied Dynamics Corp. v. Kennametal, Inc*., 965 F. Supp. 2d 276, 296 (E.D.N.Y. 2013). The minimum contacts inquiry examines whether the defendant's "conduct was purposefully directed toward the forum state." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) (internal quotation marks and emphasis omitted). The reasonableness inquiry requires that "the assertion of jurisdiction comport[] with traditional notions of fair play and substantial justice—that is, [it must be] reasonable under the circumstances of [the] case." *Kernan v. Kurz-Hastings, Inc*., 175 F.3d 236, 244 (2d Cir. 1999) (internal quotation marks omitted). Courts have observed that "dismissals on reasonableness grounds should be 'few and far between.'" *Gucci Am., Inc. v. Frontline Processing Corp*., 721 F. Supp. 2d 228, 246 (S.D.N.Y. 2010) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996)).

The exercise of personal jurisdiction over Autonomous UK and Firkins is not at odds with federal due process considerations. For the reasons discussed above, the minimum contacts inquiry is satisfied because these defendants' actions were purposefully directed at New York. *See Chloe*, 616 F.3d at 171 (stating that the "assertion of personal jurisdiction over [the defendant] comports with due process for the same reasons that it satisfies New York's long-arm statute"). Furthermore, the exercise of jurisdiction over Autonomous UK and Firkins is reasonable under the circumstances of the case. The mere fact that these Defendants are domiciled and located abroad does not make jurisdiction over them in New York inequitable.

*See Bank Brussels Lambert*, 305 F.3d at 129–30 ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." (internal quotation marks omitted)). As Plaintiff has a substantial interest in obtaining relief in New York, and because the burden on Autonomous UK and Firkins would be minimal, jurisdiction over these defendants comports with fair play and substantial justice.

Based on the foregoing, I find that Plaintiff has pled sufficient facts demonstrating that this Court had personal jurisdiction over Autonomous UK and Firkins and Defendants' motion to dismiss on these grounds is denied.

### D. *Service of Process on the UK Defendants*

#### 1. Applicable Law

When a defendant is served in a foreign country, a plaintiff must show that service was made in accordance with Federal Rule of Civil Procedure 4. Under this Rule, service may be effected "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention." Fed. R. Civ. P. 4(f)(1); *see also* Fed. R. Civ. P. 4(h)(2). Compliance with the Hague Convention, to which both the United States and the United Kingdom are signatories, is mandatory in all cases in which it applies. *Volkswagenwerk*, 486 U.S. at 705.

The Hague Convention provides for several methods by which service of process may be made. The principal method, set forth in Articles 2 through 7, is through a designated Central Authority, which in turn either serves the documents or has them served by an appropriate agency. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil

or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361.  As an alternative method, Article 10(c) of the Hague Convention allows "any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."  *Id.*

## 2.  Application

Defendants contend that service by Plaintiff was defective on the grounds that it was effected by a process server whom the United Kingdom does not consider a "competent person of the state" under Article 10(c).  I disagree.

In support of their position, Defendants rely on *Thomas & Thomas Rodmakers, Inc. v. Sharpe's, Inc*., in which the court concluded that the UK has made it "evident" that, pursuant to the Hague Convention, "personal service of foreign process in the United Kingdom [under Article 10(c)] must be accomplished by a solicitor."  (Doc. 45 at 4 (quoting *Thomas*, No. 1:06-CV-421, 2007 WL 1057382, at *5 (S.D. Ohio Apr. 5, 2007)).)  Defendants note that, in *Thomas*, the court held that "[s]ince Plaintiffs have not demonstrated that [agent who served process] is a solicitor admitted to practice in the United Kingdom, and indeed it seems evident that she is not, then Plaintiffs' service of the complaint on Defendant [] was contrary to the Hague Convention. Therefore, service on Defendant [] was invalid and the complaint as to him should be dismissed without prejudice."  (Doc. 45 at 4–5 (quoting *Thomas*, 2007 WL 1057382, at *5).)

The court in *Thomas*, in reaching its decision, relied on a letter to the Permanent Bureau of the Hague Conference on International Private Law, dated September 11, 1980, from the UK Foreign and Commonwealth Office, in which the question arose whether "the United Kingdom still intended to allow direct service on its territory by a solicitor admitted to practice in the jurisdiction."  2007 WL 1057382, at *5 (quoting Practical Handbook to the Operation of the

Hague Service Convention 62 (2006)).  In response, the Foreign and Commonwealth Office

stated, in pertinent part:

> Thank you for your letter of 31 July in which you ask for assistance in the interpretation of the declaration made by the United Kingdom on 17 November 1967 in relation to Article 10(c) of the Convention.
>
> I am happy to confirm that our declaration does not preclude any person in another Contracting State who is interested in a judicial proceeding (including his lawyer) from effecting service in the United Kingdom "directly" through a competent person other than a judicial officer or official, e.g., a solicitor.

*Id*. (citing Declarations by the United Kingdom on the Hague Convention, available at

http://www.hcch.net/index_en.php?act=status.comment&csid=427&disp=resdn (last visited

September 20, 2018)).  The *Thomas* court also relied on a more recent report from the Hague

Convention, noting that "the UK confirmed its position expressed at the Special Commission

meeting of 1989, indicating its preference for the use of direct service through English solicitors

on residents of England and Wales."  *Id.* (quoting Conclusions and Recommendations Adopted

by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and

Seizure Conventions ¶ 58 (Nov. 20, 2003)).

While I find the secondary materials cited by the *Thomas* court persuasive, I disagree

with that court's finding that personal service of foreign process in the UK must be accomplished

by a solicitor.  In fact, none of those sources explicitly state that service in the UK can only be

effectuated using solicitors.  Rather, I interpret the authorities cited by the court in *Thomas* as

indicating that the United Kingdom prefers that a solicitor be used for direct service on their

residents, but that there is no explicit requirement that a solicitor be used.  Indeed, other courts

have reached a similar conclusion.  *See Sparrow Capital, LLC v. Katcharian*, No. 11-cv-34-

WOB, 2013 WL 12176855, at *9 (E.D. Ky. Sept. 13, 2013) (finding that "the September 1980

letter cited by the *Thomas* court provides a non-exhaustive list of 'competent persons other than

a judicial officer'" and that "'[e].g.' typically means 'for example,' and this choice of wording implies that solicitors are not the only category of 'competent persons'"), *report and recommendation adopted*, 2013 WL 12177260 (E.D. Ky. Sept. 26, 2013); *see also Selmani v. Kline*, No. 2:16-cv-00264 (WJM), 2016 WL 5339574, at *2 (D.N.J. Sept. 22, 2016) ("The UK has explained that it has a *preference* for the use of direct service through English solicitors on residents of England and Wales, but it has never indicated that this is the only acceptable method of service." (internal quotation marks omitted)); *Health Sci. Distributors, Co. v. Usher-Sparks*, No. 6:10-CV-1797-Orl-31KRS, 2012 WL 601148, at *3 (M.D. Fla. Jan. 20, 2012) ("Because service of process by a process server is a method permitted by English law, it is valid under Article 10(c)."), *report and recommendation adopted*, 2012 WL 601204 (M.D. Fla. Feb. 23, 2012); *Richardson v. Att'y Gen. of the British Virgin Is.*, No. 3:08-cv-144, 2010 WL 2949438, at *1 (D.V.I. July 23, 2010) (finding service by process server proper under Hague Convention).[13]

Here, affidavits of service confirm that a UK-based process server directly served Autonomous UK and Firkins on January 19, 2018 by handing the Summons and Complaint to Firkins, who is an authorized representative of Autonomous UK. (*See* Docs. 38–39.) As such, I find that service was effected pursuant to the Hague Convention and Rule 4. *See Hoffman v. Bailey*, 996 F. Supp. 2d 477, 482 (E.D. La. 2014) (concluding that service that "was performed by a registered United Kingdom process server" was "both in compliance with Rule 4(f) and is permitted under the Hague Convention").

---

[13] The other cases cited by Defendants in support of their claims, (*see* Doc. 45 at 5), are equally unavailing as they do not contemplate the effectiveness of service by a private process server, but merely hold that the Hague Convention does not preclude direct service by a solicitor. *See Tax Lease Underwriters, Inc. v. Blackwall Green, Ltd.*, 106 F.R.D. 595, 596 (E.D. Mo. 1985) ("The 'service through official channels' declaration [of Article 10] does not preclude direct service through an English Solicitor."); *IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 511–12 (D. Conn. 2005) ("[A] report published by a[n] international, non-governmental organization on private international law states that the United Kingdom itself has indicated that it did not intend, under its declaration to the Hague convention, to preclude direct service under Article 10 by English solicitors in the United Kingdom.").

Based upon the foregoing, Defendants' motion to dismiss Plaintiff's claims against Autonomous UK and Firkins for improper service is denied.

**V.      Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED with respect to Plaintiff's SOX claims against all Defendants and Plaintiff's individual claims against Guthrie, and is DENIED with respect to the remaining claims.  I decline to reach the issues raised by Defendants' motion for summary judgment and it is DENIED without prejudice to renewal.

Furthermore, Defendants' motion to strike, (Doc. 70), is DENIED as moot.  Defendants' motion for sanctions, (Doc. 78), is also DENIED.

Counsel for the parties are directed to appear for a status conference on October 18, 2018 at 11:30 a.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York.  Counsel should be prepared to discuss the next steps of this case, including the scope of discovery, whether limited to the *Clackamas* factors or otherwise.

The Clerk of Court is respectfully directed to close the open motions at Docket Numbers 29, 44, 46, 57, 70, and 78.

SO ORDERED.

Dated: September 28, 2018
       New York, New York

Vernon S. Broderick
United States District Judge